# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ZTE CORPORATION, a corporation organized under the laws of the Peoples Republic of China, <br><br>    Plaintiff, <br><br>  vs. <br><br> VRINGO, INC., a Delaware corporation and VRINGO INFRASTRUCTURE, INC., a Delaware corporation, <br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR BREACH OF CONTRACT

Plaintiff ZTE CORPORATION ("Plaintiff" or "ZTE") brings this action against Defendants VRINGO, INC. and VRINGO INFRASTRUCTURE, INC. (together, "Vringo" or "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for breach of contract.

2. ZTE brings this action for Vringo's breach of its commitments to the European Telecommunications Standards Institute ("ETSI") and ETSI's members and affiliates to offer to license, on fair, reasonable and non-discriminatory (FRAND) terms, patents Vringo asserted as essential to practice standards set by ETSI.  In breach of those commitments, Vringo has failed to negotiate in good faith toward a FRAND license with ZTE and has failed to offer and grant a FRAND license to ZTE.  ZTE is a member of ETSI and an intended third party beneficiary of Vringo's contractual commitments to ETSI.

1

3. In further breach, Vringo filed numerous foreign actions in which it sought to obtain injunctive relief based on allegations of patent infringement for patents that had been declared to ETSI to be standard-essential (the "Vringo Asserted Patents"). Through these proceedings, which include actions in Romania, Germany, Brazil, the Netherlands, Malaysia, Australia, India, the United Kingdom, France, and Spain, Vringo seeks to harm irreparably ZTE's substantial business by enjoining importation and/or sales of its products, and seeks to extract unfair, unreasonable and excessive license terms. Yet, by virtue of its FRAND commitments, Vringo effectively agreed to forego injunctions or exclusionary relief against parties willing to agree to FRAND license terms with respect to valid and essential patents they use, as ZTE is willing to do.

## THE PARTIES

4. Plaintiff ZTE Corporation is a corporation organized under the laws of the People's Republic of China, having its principal place of business in Shenzhen, Guangdong Province, People's Republic of China.

5. Defendant Vringo, Inc. is a Delaware corporation with its principal place of business in New York, New York.

6. Defendant Vringo Infrastructure, Inc. is a Delaware corporation also having its principal place of business in New York, New York.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over ZTE's contract claims under 28 U.S.C. § 1332. This is an action between citizens of a State and citizens or subjects of a foreign state, and the value of the declaratory relief sought and damages caused by Vringo's breach of its

obligations to offer licenses on FRAND terms exceeds $75,000 exclusive of interest and costs. In addition, jurisdiction is proper in this Court as this action arises under the patent laws.

8. This Court has personal jurisdiction over each Vringo entity, and venue in this District is proper under 28 U.S.C. §§1391(b) and (c), in that each Vringo entity resides in this District, and the acts of Vringo have caused and are continuing to cause injury to ZTE.

## BACKGROUND

### Standards, Standard-Essential Patents and FRAND Obligations

9. New wireless technologies typically are only broadly commercialized after service providers and device manufacturers agree on compatible technology specifications for related products or services. For many successful wireless technologies, including those involved here, that process has involved inclusive, multi-participant efforts conducted under the auspices of leading standards development organizations ("SDOs") or standards setting organizations ("SSOs").

10. Technical standards play a critical rule in the development of wireless technologies. Standards facilitate the adoption and advancement of technology, as well as the development of interoperable products. Companies that produce standard-compatible products can design products by referencing only the standards documentation, without needing to communicate separately with every other company with which the products may need to interoperate. Companies producing products that implement and are tested to a standard can therefore be confident that their products will interoperate or communicate with other products that are also compatible with that standard.

11. Standards also reduce costs for both suppliers and purchasers. For suppliers, standards often reduce the need to develop products to a particular purchaser's specifications. A

single product line may be sold to multiple purchasers and distributed more widely, causing manufacturing volumes to increase and per unit costs to decrease.  Purchasers benefit from increased price competition among suppliers.  Because many suppliers provide standards-compliant products, switching suppliers typically does not require a substantial redesign of products or a substantial technical transfer to enable the new supplier to produce compatible products.  The lower "switching costs" intensifies competition among suppliers, leading to lower prices.

12. To be commercially successful, the technologies used to allow a consumer electronics device to connect over 3G or 4G networks are described in standards adopted by a recognized SDO (standards development organization) or SSO (standards setting organization), and thereby accepted by key industry members.

13. However, technical standardization also creates a "lock-in" effect and the risk of "patent hold-up."  Certain aspects of standards are often claimed by patents.  Before standardization, the availability of alternatives constrains the royalty a patentee can earn from a patent license for its particular technology.   But if a standard requires a designer to employ a particular technology – often referred to as a "standard-essential patent," or "SEP" – the patentee may demand royalties far exceeding what would otherwise be warranted by the technology's intrinsic value.

14. To address the likelihood of abusive practices by holders of standard-essential patents, SDOs have adopted rules, policies and procedures that address the disclosure and licensing of patents that SDO participants may assert in relation to the practice of the standard under consideration.  These rules, policies and procedures are set out in the SDO's intellectual property rights policies ("IPR Policies").

15. Many IPR Policies encourage or require participants to disclose any intellectual property rights (*e.g.*, patents or patent applications) that the participant contends are or might be essential to practice a standard under consideration.  These disclosures permit the SDO and its members to evaluate technologies with full knowledge of disclosed IPR that may affect the costs of implementing the standard.

16. IPR Policies also require participants claiming to own SEPs (standard-essential patents) to offer licenses for those patents on fair, reasonable and non-discriminatory terms to any implementer of the standard.  Such commitments from patentees are critical to developing standards, and are referred to as "FRAND" (fair, reasonable and non-discriminatory). Participants in standards development can craft technology standards with the expectation that an owner of any SEP will be prevented from demanding unfair, unreasonable or discriminatory licensing terms, which demands could prevent participants from, or impose undue costs or burdens on, implementing the standard.

## ETSI and Vringo's Contractual FRAND Commitments

17. The European Telecommunications Standards Institute ("ETSI") is an independent, non-profit SSO that produces globally-accepted standards for the telecommunications industry.  ETSI has more than 750 members from 64 countries across five continents, including ZTE and Nokia Corporation ("Nokia"), Vringo's predecessor-in-interest to the Vringo Asserted Patents.  ETSI created or helped to create numerous telecommunication standards, including the 2G/GSM, 3G/WCDMA/UMTS, and 4G/LTE cellular communication standards.

18. ETSI has adopted an Intellectual Property Rights ("IPR") Policy, incorporated as Annex 6 of the ETSI Rules of Procedure.  The ETSI IPR Policy requires members to disclose

standard-essential and potentially standard-essential patents and patent applications to ETSI and its other members. The IPR Policy further requests that SEP owners submit an irrevocable written undertaking that they are prepared to grant irrevocable licenses on FRAND terms and conditions. If a FRAND undertaking is not available, the IPR Policy provides for ETSI to attempt to change the standard to avoid the patent in question.

19. Vringo claims to have acquired a global patent portfolio from Nokia Corporation, including the Vringo Asserted Patents.

20. On the 9th of August 2012 Vringo issued a press release containing the following announcement:

"Vringo, Inc. (NYSE MKT: VRNG), a company engaged in the innovation, development and monetization of mobile technologies and intellectual property, today announced that it had entered into a Patent Purchase Agreement with Nokia Corporation pursuant to which Nokia agreed to sell Vringo Infrastructure a portfolio consisting of over 500 patents and patent applications worldwide, including 109 issued United States patents. Vringo Infrastructure agreed to compensate Nokia with a cash payment and certain ongoing rights in revenues generated from the portfolio."

"Thirty one of the 124 patent families acquired have been declared essential by Nokia to wireless communications standards." (August 9, 2012) (*available at http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_Print&ID=1724246*)

21. Vringo further claims that its global patent portfolio includes patents "essential" to 3G and 4G wireless standards, including the Vringo Asserted Patents, and that IPR declarations have been filed at ETSI declaring Vringo's patents standard-essential. In its declarations to ETSI, Nokia irrevocably agreed to grant licenses to the patents declared to be standard-essential on FRAND terms. As such, Vringo is contractually obligated to grant licenses to its standard-essential patents to ZTE on FRAND terms.

### Vringo's Patent Infringement Actions Against ZTE

22. ZTE Corporation and/or its subsidiaries manufacture and sell mobile handsets and infrastructure equipment for use on 3G and 4G wireless networks in numerous countries around the world.

23. On 25 September 2012, Vringo wrote ZTE informing ZTE that it had acquired a portfolio of unidentified patents and patent applications, a number of which had been declared to be essential for the implementation of certain GSM/GPRS, 3GPP, and UMTS standards. It stated that others, although they were not declared to be essential, could be infringed by ZTE equipment.

24. On the basis of these statements, Vringo asked ZTE to make a firm offer specifying the patents that it wanted to have licensed to it, the terms and conditions of such licenses, which were to be FRAND, and the price ZTEwas prepared to pay for the past use of the patents.

25. On 5 October 2012, without any further notice or letter before taking action, Vringo issued patent infringement proceedings in the UK High Court against ZTE (UK) Limited. In the UK, Vringo originally only asserted six patents against ZTE (presumably the strongest of the Nokia patents).

26. In further correspondence, ZTE expressed its willingness to take a license for any patents found to be valid and infringed in the UK proceedings, and requested that Vringo make a more detailed licensing proposal as well as the royalties sought in those proceedings.

27. Through a series of letters, ZTE expressed its interest in licensing valid, infringed, and essential patents on FRAND terms. This correspondence included the following paraphrased questions.

> Will the royalty be payable for all patents that have been declared essential, even if one or more of the patents are not used by ZTE?
>
> Does the same royalty rate apply to sales of infrastructure equipment in each country where there is a patent, irrespective of the number and scope of the Standards Essential Patents (SEP) in that country and even if one of the SEPs is not used or revoked?
>
> Is Vringo willing to specify a royalty which would apply on a per-patent basis?
>
> Is the royalty payable on the total value of the equipment, even if the only applicable SEP covers a relatively minor aspect of the infrastructure equipment?
>
> Is Vringo willing to consider an appropriate apportionment of revenue for the purpose of calculating the royalty?
>
> What is the basis for the proposed royalty rate?
>
> Why is this rate and approach considered by Vringo to be FRAND?

28. Through a series of correspondence Vringo responded that it was only offering a global portfolio license for all of its SEP and not on a per-patent basis.

29. Without warning, Vringo issued an application to join ZTE Corporation in the ongoing UK proceeding against ZTE (UK) and asked the court to determine the terms of a global license on FRAND terms first, before deciding issues of validity, essentiality, and infringement.

30. In June 2013 the UK Court denied Vringo's requests. The Court held that it would be unfair to set a global royalty rate, applicable in all countries, if the patents would later be held invalid. The Court added that ZTE's refusal to take a license to invalid and/or not infringed patents did not make it an unwilling licensee.

31. Vringo has aggressively litigated allegedly standard-essential patents against ZTE around the world, demanding excessive royalties and seeking injunctive relief.

32. Vringo sued ZTE in Germany (February 20, 2013 in the Mannheim District Court and September 13, 2013 in the Dusseldorf District Court) asserting infringement of the German part of two patents which are subject to standard-essential declarations at ETSI. Vringo, News Release, "Vringo Provides Scheduling Update on German Hearing in ZTE Litigation" (October 10, 2013) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=1863372). Vringo withdrew the Mannheim complaint on December 4, 2014. Vringo obtained a permanent injunction against ZTE in that action, prohibiting ZTE from selling or importing 3G UMTS SDR Base Stations. Vringo, News Release, "Vringo Issues Update on Recent Events in its Litigations Against ZTE" (February 2, 2015) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=2012551).

33. Vringo filed an infringement action in France on March 2, 2013 seeking an injunction against ZTE.

34. On June 11, 2013 Vringo filed a patent infringement action in Australia asserting patent infringement.

35. On November 8, 2013 Vringo filed an infringement action in India and requested a preliminary injunction. The action for injunction was dismissed in August 2014.

36. On June 23, 2014, Vringo sued ZTE in Romania, alleging infringement of the Romanian part of European Patent 1,808,029, which has been declared essential to ETSI in connection with 4G LTE standards.  Vringo, News Release, "Vringo Files Lawsuit Against ZTE in Romania" (June 26, 2014) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=1942976).

37. In the Romanian action, Vringo sought damages and a permanent injunction, and in a parallel proceeding Vringo requested and obtained in July 2014, *ex parte*, an interim injunction prohibiting ZTE and its distributors from importing, exporting, introducing on the market, offering for sale, storing, selling, distributing, promoting and/or conducting any other trading activity with respect to any 4G/LTE mobile phone and any infrastructure equipment produced by ZTE which incorporates 4G/LTE technology.  Vringo, News Release, "Vringo Provides Update on Romanian Litigation" (October 13, 2014) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=1976850).

38. On January 8, 2015, the Romanian Court rejected ZTE's appeal of the interim injunction and immediately reinstated the injunction.  As a result, on February 2, 2015, Vringo issued a press release stating that it has initiated efforts to enforce the injunction, including that it has provided notice to vendors of ZTE handsets and infrastructure equipment to inform them that the Court has ordered them to cease all sales of ZTE 4G/LTE products in Romania.  Vringo, News Release, "Vringo Issues Update on Recent Events in its Litigations Against ZTE" (February 2, 2015) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=2012551).

39. Vringo also filed an action against ZTE in Brazil in April 2014 alleging patent infringement.  In that action, Vringo again sought and obtained an injunction restraining ZTE

10

from manufacturing, using, offering for sale, selling, installing, testing, or importing 3G/4G/LTE infrastructure equipment.  Vringo took action to enforce the injunction on April 17, 2014 and the injunction remains in place today.  Vringo, News Release, "Vringo Issues Update on Recent Events in its Litigations Against ZTE" (February 2, 2015) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=2012551) and Vringo, News Release, "Brazilian Court Upholds Injunction Against ZTE for Infringement of Vringo Patent" (June 18, 2014) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-newsArticle_pf&ID=1940780).

40.     On June 23, 2014 Vringo filed a patent infringement action against ZTE in Malaysia and is seeking a preliminary injunction.  The injunction hearing is scheduled for March 9, 2015.

41.     On July 30, 2013 Vringo filed an infringement action in Spain seeking injunctive relief.  The Spanish action is now stayed.

42.     In the Netherlands Vringo requested Dutch customs authorities to seize containers containing ZTE infrastructure equipment.

43.     Indeed, Vringo has publicly threatened to continue its agressive behavior in the court systems throughout the world.  *See (*http://finance.yahoo.com/news/vringo-issues-recent-events-litigations-133203404.html) stating "Vringo will continue to enforce its rights through the courts world-wide in response to ZTE's unwillingness to license Vringo's patents."

44.     In each of the actions against ZTE detailed above asserting infringement of patents that had been declared to ETSI as essential to 3G and/or 4G/LTE, Vringo sought and obtained injunctive relief.  Such requests are consistent with Vringo's requests for injunctive relief in other actions involving allegedly standard-essential patents.

45. In addition to its aggressive litigation tactics, which rely heavily on improper attempts to use allegedly standard-essential patents to obtain injunctive relief, Vringo has staked out a highly aggressive licensing posture for its allegedly standard-essential patents. For example, according to documents available on Vringo's website, in May 2013, Vringo provided ZTE with a term sheet setting forth the terms under which it would license its standard essential patents:

> d. **Applicable Royalty Rates**.
>
> ZTE may elect to take a license to all of the Essential Patents for the GSM Standard, the UMTS Standard and the LTE Standard together at the following rates:
>
> $2.50 for each Smartphone made or sold by ZTE and $1.20 for all other Subscriber Units sold by ZTE.
>
> 1.50% of Infrastructure Revenues.
>
> ZTE may also elect to take separate licences under the GSM Patents, UMTS Patents and LTE Patents at the following rates:
>
> |  | GSM | UMTS | LTE |
> |---|---|---|---|
> | Smartphone | $0.85 | $0.85 | $0.85 |
> | Subscriber Unit | $0.40 | $0.40 | $0.40 |
> | Infrastructure Revenues | 0.5% | 0.5% | 0.5% |
>
> Any license to a single Standard shall be for single-mode products compliant with that Standard only. Any license to two Standards shall only cover single-mode products compliant with the two Standards and dual-mode products compliant with both Standards

*See* essential patent license term sheet (*publicly available at* http://www.vringoip.com/documents/FG/vringo/ip/35142_CMC_Term_Sheet.pdf); *see also* Vringo, News Release, "Vringo Announces Update on ZTE Litigation" (November 12, 2013) (*available at* http://phx.corporate-ir.net/phoenix.zhtml?c=235370&p=irol-

12

newsArticle_pf&ID=1875225). The royalty demands set forth in this term sheet are excessive and further violate Vringo's contractual FRAND obligations.

46. ZTE seeks damages for Vringo's breach of its agreements to offer to license its allegedly standards essential patents on a FRAND basis. ZTE also seeks specific performance to enforce the irrevocable written undertaking provided to ETSI requiring Vringo to license standard essential patents on FRAND terms. ZTE further requests injunctive relief to prohibit Vringo from undertaking actions inconsistent with the undertaking provided to ETSI and its FRAND obligations to ZTE.

## FIRST CLAIM FOR RELIEF

(Breach of Contract)

47. ZTE realleges and incorporates by reference paragraphs 1 through 47, inclusive, as though fully set forth in this paragraph.

48. The conduct of Vringo as alleged above constitutes breach of contract.

49. As set forth above, Vringo and/or Nokia, Vringo's predecessor-in-interest to the Vringo Asserted Patents and Vringo's global patent portfolio, entered into express or implied contracts with ETSI, 3GPP, their members, and manufacturers and sellers of products designed to be compliant with standards adopted by these SSOs, including ZTE and its subsidiaries, to negotiate in good faith and grant licenses to its purportedly essential IPR on FRAND terms. Having acquired Nokia's patent portfolio, including the Vringo Asserted Patents, Vringo assumed Nokia's contractual commitments, including the obligation to offer a license to any standards-essential patents on FRAND terms, consistent with the ETSI IPR Policy.

50. Vringo has breached and continues to breach its contracts by failing to negotiate in good faith. Separately, Vringo has breached and continues to breach its contracts by failing to

license purportedly essential IPR, including the Vringo Asserted Patents, on FRAND terms, and by seeking to obtain injunctive relief for alleged infringement of such patents, including in Romania, Germany and Brazil.

51.     As a result of Vringo's repeated breaches of its contractual obligations, ZTE has been injured, including sustaining injury to its business and property.  ZTE has been forced to expend considerable resources responding to Vringo's actions that are entirely inconsistent with its contractual obligations including this licensing dispute and the numerous patent infringement actions that Vringo has prosecuted or threatened against ZTE around the world.  Vringo's actions are causing and continue to cause irreparable harm to ZTE through lost market share and opportunities as well as lost profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.  ZTE has suffered damages and irreparable harm, and will suffer further damage and irreparable harm, by reason of each and all of the acts, practices, breaches and conduct of Vringo alleged above until and unless the Court enjoins Vringo from pursuing its infringement actions and from enforcing the injunctions Vringo obtained in Romania, Germany and Brazil.

52.     Among other remedies, ZTE seeks specific performance of the contract entered into by Vringo and/or Nokia with ETSI and other SSOs.

### SECOND CLAIM FOR RELIEF

(Breach of Contract – Third Party Beneficiary)

53.     ZTE realleges and incorporates by reference paragraphs 1 through 53, inclusive, as though fully set forth in this paragraph.

54.     As set forth above, Vringo and/or Nokia, its predecessor-in-interest to the Vringo Asserted Patents and Vringo's global patent portfolio, entered into express or implied contracts

with ETSI, 3GPP, and their members, to negotiate in good faith and grant licenses to its purportedly essential IPR on FRAND terms. Having acquired Nokia's patent portfolio, including the Vringo Asserted Patents, Vringo assumed Nokia's contractual commitments, including the obligation to offer a license to any standards-essential patents on FRAND terms, consistent with the ETSI IPR Policy.

55. Vringo's contracts with these SSOs, and in particular Vringo's commitments in the contracts to grant applicants licenses to its purportedly essential IPR on FRAND terms, evince a clear intent that the contracts benefit ZTE and other third parties who might require a license to the patents.

56. These same contractual commitments create a duty on behalf of Vringo to license its purportedly standard-essential patents on FRAND terms.

57. It is only by Vringo's fulfilling its promise to license the purportedly standard-essential patents on FRAND terms that ZTE will receive the intended benefit of being able to practice the implicated standards free from unreasonably high and discriminatory licensing demands.

58. Vringo has breached and continues to breach its contracts by failing to negotiate in good faith. Separately, Vringo has breached and continues to breach its contracts by failing to license purportedly essential IPR, including the Vringo Asserted Patents, to the contracts' third-party beneficiary, ZTE, on FRAND terms, and by seeking to obtain injunctive relief for alleged infringement of such patents, actions clearly inconsistent with its FRAND obligations, in Romania, Germany, Brazil, and elsewhere.

59. As a result of Vringo's repeated breaches of its contractual obligations, ZTE has been injured, including sustaining injury to its business and property. ZTE has been forced to

expend considerable resources responding to Vringo's actions that are entirely inconsistent with its contractual obligations including this licensing dispute and the numerous patent infringement actions that Vringo has prosecuted or threatened against ZTE around the world.  Vringo's actions are causing and continue to cause irreparable harm to ZTE through lost market share and opportunities as well as lost profits, loss of customers and potential customers, loss of goodwill and product image, and uncertainty among customers and potential customers.  ZTE has suffered damages and irreparable harm, and will suffer further damage and irreparable harm, by reason of each and all of the acts, practices, breaches and conduct of Vringo alleged above until and unless the Court enjoins Vringo from pursuing its infringement actions and from enforcing the injunctions Vringo obtained in Romania, Germany and Brazil.

60. Among other remedies, ZTE seeks specific performance of the contract entered into by Vringo and/or Nokia with ETSI and other SSOs.

## PRAYER FOR RELIEF

WHEREFORE, ZTE prays for a judgment against Vringo as follows:

1. A judgment that Vringo has breached its contracts with ZTE by failing to negotiate in good faith and/or to grant licenses on FRAND terms to purported standard-essential patents, including the Vringo Asserted Patents, ordering specific performance of FRAND licensing obligations, and awarding appropriate damages in an amount to be proven at trial;

2. A judgment that Vringo has breached its contracts with ZTE by seeking injunctive relief with respect to Vringo's purported standard-essential patents, including the Vringo Asserted Patents, and awarding appropriate damages in an amount to be proven at trial;

3. A judgment that Vringo has breached its contracts with the SSOs, harming ZTE as a third-party beneficiary of those contracts, by failing to negotiate in good faith and/or to grant

licenses on FRAND terms to purported standard-essential patents, including the Vringo Asserted Patents, ordering specific performance of FRAND licensing obligations, and awarding appropriate damages in an amount to be proven at trial;

4. A judgment that Vringo has breached its contracts with the SSOs, harming ZTE as a third-party beneficiary of those contracts, by seeking injunctive relief with respect to Vringo's purported standard-essential patents, including the Vringo Asserted Patents, and awarding appropriate damages in an amount to be proven at trial;

5. Preliminary and permanent injunctive relief preventing Vringo from enforcing any injunction against ZTE relating to Vringo's purported standard-essential patents, including but not limited to the injunctions entered in Romania, Germany, and Brazil, and preventing Vringo from seeking any such injunctive relief in the future;

6. Award ZTE its expenses, costs and attorneys' fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure; and

7. Grant ZTE such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, ZTE requests a trial by jury of any issues so triable by right.

Dated:  February 5, 2015              */s/ Mary B. Matterer*
                                      Richard K. Herrmann (#405)
                                      Mary B. Matterer (#2696)
                                      MORRIS JAMES LLP
                                      500 Delaware Ave., Suite 1500
                                      Wilmington, DE 19801-1494
                                      (302) 888.6800
                                      rherrmann@morrisjames.com
                                      mmatterer@morrisjames.com

        Steven A. Moore (CA SBN 232114)
        steven.moore@pillsburylaw.com
        Callie Bjurstrom (CA SBN 137816)
        callie.bjurstrom@pillsburylaw.com
        Nicole S. Cunningham (CA SBN 234390)
        nicole.cunningham@pillsburylaw.com
        PILLSBURY WINTHROP SHAW PITTMAN LLP
        501 W. Broadway, Suite 1100
        San Diego, CA  92101-3575
        Telephone: (619) 234-5000
        Facsimile:  (619) 236-1995

        Barry K. Shelton (TX SBN 24055029)
        barry.shelton@pillsburylaw.com
        PILLSBURY WINTHROP SHAW PITTMAN LLP
        221 West 6th Street, Suite 1110
        Austin, TX 78701-3443
        Telephone: 512.375.4907
        Facsimile: 512.479.6745

        *ATTORNEYS FOR PLAINTIFF*
        *ZTE CORPORATION*