## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ZTE CORPORATION**<br><br>                              **Plaintiff,**<br><br>**vs.**<br><br>**VRINGO, INC., and**<br>**VRINGO INFRASTRUCTURE, INC.,**<br><br>                              **Defendants** | **Case No.  1:15-cv-00986-LAK** |

### VRINGO'S FIRST AMENDED ANSWER AND COUNTERCLAIMS

Defendants Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo") by and through their undersigned counsel, hereby respond to the Complaint for Breach of Contract of Plaintiff ZTE Corporation ("ZTE") and allege as follows.  To the extent not expressly admitted herein, Vringo denies the allegations of the Complaint.

1.       Responding to the allegations in Paragraph 1, Vringo avers that they set forth a legal conclusion as to which no responsive pleading is required.

2.       Vringo denies the allegations in Paragraph 2.

3.       Vringo admits that it has filed foreign actions in Romania, Germany, Brazil, the Netherlands, Malaysia, Australia, India, the United Kingdom, France, and Spain, and that it has sought injunctive relief in certain of those countries on patents that have been declared to ETSI to be standard essential patents, and denies the remainder of the allegations in Paragraph 3.

4.       Vringo admits on information and belief the allegations in Paragraph 4.

5.       Vringo admits the allegations in Paragraph 5.

6.       Vringo admits the allegations in Paragraph 6.

7.      Responding to the allegations in Paragraph 7, Vringo avers that they set forth a legal conclusion as to which no responsive pleading is required.

8.      Responding to the allegations in Paragraph 8, Vringo avers that they set forth a legal conclusion as to which no responsive pleading is required.

9.      Vringo admits that multiple parties participate in standards development organizations ("SDOs") and standards setting organizations ("SSOs") to develop standards for the telecommunications industry, and denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 9.

10.     Vringo admits that technical standards are part of the development of wireless technologies and allow products from different companies to interoperate or communicate with each other, and denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 10.

11.     Vringo denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11.

12.     Vringo admits that technologies used to allow a consumer electronics device to connect over 3G or 4G networks are described in standards adopted by a SDO (standards development organization) or SSO (standards setting organization), and denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 12.

13.     Vringo admits that certain aspects of standards may be covered by the claims of certain patents, and denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 13.

14.     Vringo admits that certain SDOs have adopted policies that address the disclosure and licensing of patents and that these policies are set out in various SDO's intellectual property rights policies ("IPR Policies").  Vringo denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 14.

15.     Vringo admits that there are IPR Policies that encourage or require participants to disclose certain intellectual property rights (*e.g.*, patents or patent applications) that the participant contends are or might be essential to practice a standard under consideration.  Vringo denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 15.

16.     Vringo admits that there are IPR Policies that require owners of SEPs (standard-essential patents) to offer licenses for those patents on fair, reasonable and non-discriminatory terms ("FRAND").  Vringo denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 16.

17.     Vringo admits that the European Telecommunications Standards Institute ("ETSI") is an independent, non-profit SSO that develops standards for the telecommunications industry.  Vringo further admits that ZTE and Nokia Corporation ("Nokia"), Vringo's predecessor-in-interest to Vringo's standard essential patents, are members of ETSI.  Vringo further admits that ETSI created or helped to create numerous telecommunication standards, including the 2G/GSM, 3G/WCDMA/UMTS, and 4G/LTE cellular communication standards. Vringo denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 17.

18.     Vringo admits that ETSI has adopted an Intellectual Property Rights ("IPR") Policy, and refers to that IPR policy for its contents.

19.     Vringo admits that it has acquired a global patent portfolio from Nokia Corporation, including standard essential patents.

20.     Vringo admits that it issued a press release on August 9, 2012, and refers to that press release for its contents.

21.     Vringo admits that its global patent portfolio includes patents declared to ETSI to be standard-essential patents to 3G and 4G wireless standards.  Vringo further admits that IPR declarations have been filed with ETSI declaring certain of Vringo's patents to be standard-essential patents.  Vringo further admits that, in its declarations to ETSI, Nokia irrevocably agreed to grant licenses to the patents declared to be standard-essential on FRAND terms per the requirements of the ETSI IPR Policy at the time.  Vringo admits that as a part of the acquisition of the Vringo SEPs from Nokia, Vringo contractually affirmed that it undertook to abide by all applicable obligations to ETSI.  Vringo denies the remainder of the allegations in Paragraph 21.

22.     Vringo admits the allegations in Paragraph 22.

23.     Vringo admits that on September 25, 2012, it sent a letter to ZTE and refers to that letter for its contents.

24.     Vringo admits that on September 25, 2012, it sent a letter to ZTE and refers to that letter for its contents.

25.     Vringo admits that on October 5, 2012, Vringo initiated patent infringement proceedings in the UK High Court against ZTE (UK) Limited.  Vringo further admits that it has sued ZTE on six patents in the UK.  Vringo denies the remainder of the allegations in Paragraph 25.

26.     Vringo admits that, in a letter from ZTE's UK counsel dated March 14, 2013, ZTE stated that "ZTE will take a license on FRAND terms under any of the Patents which is

found to be infringed in these [UK] proceedings," and further stated that Vringo "must now provide a draft licence of the terms which Vringo contends to be FRAND." Vringo denies the remainder of the allegations in Paragraph 26.

27. Vringo admits that ZTE has sent a series of letters to Vringo, and denies knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in Paragraph 27.

28. Vringo admits that it has offered ZTE a global license portfolio for all of its SEPs on terms as set forth in Vringo's March 28, 2013 "essential patent license term sheet," and not on a per-patent basis, and denies the remainder of the allegations in Paragraph 28.

29. Vringo admits that Vringo issued an application to join ZTE Corporation in the UK proceeding against ZTE (UK) and asked the court to determine the terms of a global license on FRAND terms first, before deciding issues of validity, essentiality, and infringement, and denies the remainder of the allegations in Paragraph 29.

30. Vringo admits that in June 2013 the UK Court issued an order, and refers to that order for its contents. Vringo denies the remainder of the allegations in Paragraph 30.

31. Vringo admits that it has litigated standard-essential patents against ZTE in several countries and in certain countries has sought and received injunctive relief, and denies the remainder of the allegations in Paragraph 31.

32. Vringo admits that it sued ZTE in the Mannheim Regional Court in Germany on November 15, 2012 for infringement of European Patent No. 1212919 and, on February 20, 2013, extended that suit to include infringement of European Patent No. 1186119. Both of these patents have been declared to ETSI to be standard-essential patents. Vringo further admits that it sued ZTE in the Düsseldorf Regional Court in Germany on September 13, 2013 for infringement

of European Patent No. 0748136, which was not declared to ETSI to be a standard-essential patent.  Vringo further admits that it withdrew the litigation related to European Patent No. 1212919, and subsequently refiled it in the Düsseldorf Regional Court.  Vringo further admits that it obtained an injunction against ZTE for infringement of European Patent No. 1186119, prohibiting ZTE from selling or importing 3G UMTS SDR Base Stations.  Vringo admits that it has issued press releases regarding this litigation, and refers to those press releases for their contents.  Vringo denies the remainder of the allegations in Paragraph 32.

33.    Vringo admits that it filed an infringement action in France in April 2013 seeking an injunction against ZTE, and denies the remainder of the allegations in Paragraph 33.

34.    Vringo admits the allegations in Paragraph 34.

35.    Vringo admits that on November 7, 2013, Vringo filed an infringement action in India and requested a preliminary injunction.  Vringo further admits that it was granted a preliminary injunction that was substituted by an interim arrangement by which ZTE was required to post a bond and inform Vringo of all imports of certain ZTE products into India. Vringo denies the remainder of the allegations in Paragraph 35.

36.    Vringo admits the allegations in Paragraph 36.

37.    Vringo admits that in the Romanian action, Vringo sought damages and a permanent injunction.  Vringo further admits that in a parallel proceeding Vringo requested and obtained on June 30, 2014, from the Bucharest Tribunal 4th Civil Division, an *ex parte* preliminary injunction against ZTE – order no. 801/2014 in case no. 21326/3/2014 – ordering ZTE to cease any importation, exportation, introduction on the market, offer for sale, storage, sale, trade, distribution, promotion/or any other business activity regarding the mobile phones manufactured by ZTE Corporation which use the 4G/LTE technology and the infrastructure

equipment manufactured by ZTE Corporation which incorporate the 4G/LTE technology until a final decision is being taken in the pending case no. 21321/3/2014.  Vringo admits that it issued a press release entitled "Vringo Provides Update on Romanian Litigation ZTE" on October 13, 2014, and refers to that press release for its contents.  Vringo denies the remainder of the allegations in Paragraph 37.

38.     Vringo admits that on January 8, 2015, after considering the issues briefed by the parties, the Bucharest Court of Appeals: (i) denied ZTE's appeal seeking cancellation of the order no. 801/2014 of the Bucharest Tribunal granting the preliminary injunction of the preliminary injunction; and (ii) revoked the interim suspension of enforcement of the preliminary injunction.  Vringo admits that it issued a press release entitled "Vringo Issues Update on Recent Events in its Litigations against ZTE" on February 2, 2015, and refers to that press release for its contents.  Vringo denies the remainder of the allegations in Paragraph 38.

39.     Vringo admits that it filed an action against ZTE in Brazil in April 2014 alleging patent infringement.  Vringo further admits that in that action, it sought and obtained an injunction, the terms of which are set forth in the Brazilian court's injunction order dated April 15, 2014.  Vringo further admits that it took steps to enforce the injunction and that the injunction remains in force today.  Vringo admits that it has issued press releases regarding this litigation, and refers to those press releases for their contents.  Vringo denies the remainder of the allegations in Paragraph 39.

40.     Vringo admits that on June 23, 2014, Vringo filed a patent infringement action against ZTE in Malaysia, and sought a preliminary injunction, which request was subsequently withdrawn.  Vringo denies the remainder of the allegations in Paragraph 40.

41.     Vringo denies the allegations in Paragraph 41.

42.     Vringo admits that at the end of April 2014, Dutch customs in Rotterdam detained a container with UMTS-equipment originating from ZTE Corporation in China. The detention was based on the European Anti-Piracy Regulation (Regulation EU Nr. 608/2013) and followed a request for action that was filed by Vringo and granted by the Dutch customs authorities in 2013.  After the detention, Vringo had the products seized for surrender on the basis of infringement of the Dutch part and the German part of the European Patent No. 1186119.

43.     Vringo admits that it has stated "Vringo will continue to enforce its rights through courts world-wide in response to ZTE's unwillingness to license Vringo's patents," and denies the remainder of the allegations in Paragraph 43.

44.     Vringo admits that it sought and obtained injunctive relief in Germany, Brazil, and Romania, which relates to infringement of standard-essential patents, and denies the remainder of the allegations in Paragraph 44.

45.     Vringo admits that in March 2013, Vringo provided ZTE with a term sheet setting forth the terms under which it would license its standard essential patents to ZTE.  Vringo admits that it published the term sheet on its website.  Vringo further admits that it has issued press releases regarding its litigation with ZTE, and refers to those press releases for their contents. Vringo denies the remainder of the allegations in Paragraph 45.

46.     Responding to the allegations in Paragraph 46, Vringo avers that they set forth a legal conclusion as to which no responsive pleading is required.

47.     Vringo hereby reiterates and incorporates its foregoing responses to Paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48.     Vringo denies the allegations in Paragraph 48.

49.      Vringo admits that as a part of the acquisition of the Vringo SEPs from Nokia, Vringo contractually affirmed that it undertook to abide by all applicable obligations to the relevant SSOs, and denies the remainder of the allegations in Paragraph 49.

50.      Vringo denies the allegations in Paragraph 50.

51.      Vringo denies the allegations in Paragraph 51.

52.      Responding to the allegations in Paragraph 52, Vringo avers that they set forth a legal conclusion as to which no responsive pleading is required.

53.      Vringo hereby reiterates and incorporates its foregoing responses to Paragraphs 1 through 52 of the Complaint as if fully set forth herein.

54.      Vringo admits that as a part of the acquisition of the Vringo SEPs from Nokia, Vringo contractually affirmed that it undertook to abide by all applicable obligations to the relevant SSOs, and denies the remainder of the allegations in Paragraph 54.

55.      Vringo denies the allegations in Paragraph 55.

56.      Vringo admits that as a part of the acquisition of the Vringo SEPs from Nokia, Vringo contractually affirmed that it undertook to abide by all applicable obligations to the relevant SSOs, and denies the remainder of the allegations in Paragraph 56.

57.      Vringo denies the allegations in Paragraph 57.

58.      Vringo denies the allegations in Paragraph 58.

59.      Vringo denies the allegations in Paragraph 59

60.      Responding to the allegations in Paragraph 60, Vringo avers that they set forth a legal conclusion as to which no responsive pleading is required.

WHEREFORE, Vringo demands that the Complaint be dismissed as against it and that it be awarded the costs and disbursements hereof, together with such other and further relief as the Court deems just and proper.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by its breaches of the implied covenants of good faith and fair dealing.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrines of waiver and estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of international comity.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of *res judicata*.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because plaintiffs have not suffered any damages as a result of any alleged acts or omissions by defendants.

## EIGHTH AFFIRMATIVE DEFENSE

Part or all of the damages sought by plaintiff may not be recovered under applicable law.

Vringo reserves the right to add affirmative defenses as the same may appear as the result of further investigation and/or discovery.

## COUNTERCLAIMS

Pursuant to Federal Rules of Civil Procedure 13 and 18, Counterclaim Plaintiffs Vringo, Inc. and Vringo Infrastructure, Inc. (collectively, "Vringo") assert these counterclaims against Counterclaim Defendant ZTE Corporation ("ZTE") seeking a declaration determining what

would constitute fair, reasonable, and non-discriminatory ("FRAND") license terms for a license to Vringo's standard essential patents ("SEPs") or, in the alternative, a finding that ZTE has breached its FRAND obligations and requiring specific performance of those obligations and/or granting damages and/or termination of the contract as a result of the breach.   While there are a number of actions pending between Vringo and ZTE around the world, none of these actions will result in terms being set for a global license to Vringo's SEPs.   In support of these claims, Vringo hereby alleges as follows:

## THE PARTIES

1.      Vringo, Inc. is a corporation organized under the laws of Delaware, having its principal place of business at 780 Third Avenue, 12th Floor, New York, New York 10017.

2.      Vringo Infrastructure, Inc. is a corporation organized under the laws of Delaware, having its principal place of business at 780 Third Avenue, 12th Floor, New York, New York 10017.

3.      ZTE Corporation is a corporation organized under the laws of China, having its principal place of business in Shenzhen, China.

## NATURE OF THE ACTION

4.      This is a civil action for, among other things, a declaratory judgment determining what would constitute FRAND terms for a license from Vringo to ZTE for Vringo's portfolio of SEPs including the GSM/GPRS/EDGE, WCDMA/UMTS, CDMA2000, and LTE standards ("the Vringo SEPs").

5.      In the alternative, if the Court finds that Vringo is a party to a contract with a standards setting organization ("SSO") and that ZTE is a party to or third party beneficiary of that contract, or the parties are otherwise contractually bound to each other, Vringo seeks a judgment:   (1) finding that ZTE breached the contract; (2) requiring specific performance of

ZTE's own obligations under any such contract to enter into a license on FRAND terms with Vringo for a license to the Vringo SEPs; and/or (3) granting damages and/or contract termination.

6.     Vringo agrees to be unconditionally bound to enter into a license on the FRAND terms set forth by this Court, which Vringo believes should be global in scope and should cover Vringo's entire portfolio of SEPs.

7.     While there are a number of actions pending between Vringo and ZTE around the world, none of these actions will result in terms being set for a global license to Vringo's SEP's.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over Vringo's counterclaims pursuant to 28 U.S.C. §§ 1332 and 1367.

9.     Venue lies in this District pursuant to 28 U.S.C. § 1391(a).

## BACKGROUND

**Vringo Overview**

10.     Vringo, Inc., which is publicly traded on the NASDAQ, was founded in 2006 and, until the sale of its mobile partnerships and application business in February 2014, developed and distributed mobile application products and services through partnerships with handset manufacturers and mobile network operators.

11.     Vringo, Inc. offered its social and video ringtone mobile applications globally through mobile application stores.  Vringo, Inc. was awarded the "Global Telecom Business Wireless Network Infrastructure Innovation Award" for launch of the world's first Video Ringtone Service and was also chosen by AlwaysOn as one of its "On Media Top 100 Winners." It was also given the "Sony Ericsson Special Recognition Award" for best use of all functionality

and the "MIPCOM Mobile and Internet Award" for "Best Mobile Service for Social Community and User Generated Products."

12.     Vringo Infrastructure, Inc., a subsidiary of Vringo, Inc., is an early stage technology company that was founded in August 2012, at which time it acquired a global patent portfolio covering a variety of technologies.  Vringo's intellectual property portfolio consists of more than 600 patents and patent applications covering a variety of technologies related to mobile handsets, telecommunications infrastructure, and wireless communications.

**Telecommunications Standards**

13.     Telecommunications standards are an important part of the global economy. Standards are a tool used to disseminate information regarding the best and most efficient way to implement technologies.   In order to develop standards, telecommunications companies voluntarily cooperate through SSOs, also known as standard development organizations ("SDOs") such as the European Telecommunications Standards Institute ("ETSI"), and partnerships of SSOs such as the 3rd Generation Partnership Project ("3GPP"). Telecommunications companies rely on standardization to guarantee proper operation of equipment.  The technical standards describe in detail the technology for inter-operability between telecommunications equipment (e.g., mobile devices, infrastructure equipment) so that equipment from different manufacturers can inter-operate with each other.

14.     ETSI was created in 1988 as an independent, non-profit organization in the telecommunications industry (which includes equipment makers and network operators).  ETSI has been successful in promulgating standards related to 2G (GSM), 3G (UMTS), and 4G (LTE) technology.  ETSI inspired the creation of, and is a partner in, 3GPP, which is a collaboration between groups of SSOs known as Organizational Partners.

13

15.     ETSI, the organization which oversees the UMTS and LTE mobile telecommunications standards, among others, seeks "to create STANDARDS and TECHNICAL SPECIFICATIONS that are based on solutions which best meet the technical objectives of the … telecommunications sector" and therefore "seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of owners of IPRs."  Exhibit 1, ETSI IPR Policy, Section 3.

**Standard Essential Patents**

16.     A patent covering technology that must be used by a device in order for that device to be deemed compliant with the standard is known as an SEP (*i.e.*, the patent is "essential" to the standards to which it corresponds).  In particular, the ETSI IPR Policy defines "ESSENTIAL" as applied to a patent as meaning that it is not possible on technical grounds "to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR." Exhibit 1, ETSI IPR Policy, Section 15, Definition 6 (March 20, 2013).

17.     As such, any company that manufactures, sells, or otherwise offers standard-compliant products must obtain licenses to the intellectual property rights ("IPR") (e.g., patents and patent applications) that cover the technologies disclosed in the standards relevant to those products.

18.     Section 4 of the ETSI IPR Policy sets forth that ETSI members must notify ETSI of any IPR (including patents or patent applications) which is or may become  essential to a standard promulgated by ETSI:

> Subject to Clause 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis,

draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

The obligations pursuant to Clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

The obligations pursuant to Clause 4.1 above are deemed to be fulfilled in respect of all existing and future members of a PATENT FAMILY if ETSI has been informed of a member of this PATENT FAMILY in a timely fashion. Information on other members of this PATENT FAMILY, if any, may be voluntarily provided.

19.     ETSI's IPR Policy advises that "IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS."   Exhibit 1, ETSI IPR Policy, Clause 3.2.  By providing adequate and fair reward for IPR, ETSI promotes participation in the standards process and encourages investment in standards development by its members.

**<u>FRAND</u>**

20.     ETSI members typically also commit to be prepared to grant licenses to their SEPs on FRAND terms and conditions as set forth in Section 6.1 of the ETSI IPR Policy.   The so-called FRAND commitment to ETSI, as set forth in the model declaration provided by ETSI, is simply to be "prepared to grant irrevocable licenses under its/their IPR(s) on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD(S) . . . to the extent that the [declared] IPR(s) remain ESSENTIAL".   Exhibit 1, ETSI IPR Policy, Appendix A, IPR Licensing Declaration forms (March 20, 2013).[1]   The corollary of a patent holder committing in the standard setting context to be prepared to grant licenses to its SEPs on FRAND terms and conditions, is that a potential licensee must be willing

---

[1] Section 12 of the ETSI IPR Policy provides that the Policy shall be governed by the laws of France.  Exhibit 1, ETSI IPR Policy, Section 12.

to enter into a FRAND license agreement for the SEPs in question.  Thus, for standards developed within ETSI, there is an expectation that companies will negotiate reasonable terms and conditions on a bilateral basis.

21.     A patent holder's FRAND obligation is an obligation to be prepared to grant a license to its SEPs on FRAND terms and conditions.  If a license is not requested, is refused, or is requested by a potential licensee without the means to pay for it, no further obligation remains on the part of the SEP owner.  An SEP owner is not obligated to negotiate against itself if a potential licensee (e.g., manufacturer of mobile handsets or infrastructure equipment) refuses to engage in good faith negotiations.

22.     To the extent that a patent holder's declaration of essential or potentially essential patents operates as a binding commitment that can be enforced by a party seeking to manufacture standard-compliant products, such a manufacturer must be bound by a set of FRAND obligations.  Among these obligations on the part of the manufacturer is the obligation to accept a license offer on FRAND terms that is extended by a patent holder.  If this were not so, a manufacturer could manufacture products making use of essential patents indefinitely without paying compensation of any kind, as ZTE is attempting to do.  ZTE is familiar with FRAND commitments made to ETSI.  In fact, ZTE is a member of ETSI and has made a general declaration to ETSI in which it agreed to license any of its own IPRs which are or may become essential to any of ETSI's standards, on FRAND terms and conditions.  Exhibit 2, ZTE General IPR Licensing Declaration to ETSI (November 16, 2010), signed by Min Fang, Director of IPR, available at http://ipr.etsi.org/GdDetails.aspx?IPRD_ID= 1060&IPRD_TYPE_ID=1&MODE=2.

**FRAND Licenses are Negotiated on a Portfolio Basis**

23.     Typical licensing practice in the telecommunication industry is to license patents on a portfolio basis either for one or more standards at a time.

24.     Companies with portfolios of SEPs typically license their SEPs on a portfolio basis rather than a per-patent basis because standards-compliant equipment will usually require licenses to all SEPs in a portfolio relevant to the specific standards in question.  In other words, it does no good for a manufacturer of standards-compliant equipment to license one SEP owned by a patent owner if the manufacturer requires a license to several other SEPs held by the patent owner for the same standard in order to manufacture standards-compliant equipment.

25.     It is well known in the industry that many companies that license SEPs make their royalty rates for their SEPs – "rack rates" – public.  The rack rates are almost always expressed as a portfolio-wide percentage royalty rate to be applied on a per-device basis or based on a relevant business unit's revenue.  For example, many of the leading industry players, including Alcatel-Lucent, Ericsson, Huawei, Motorola, Nokia, and Qualcomm and ZTE, have publicly announced specific rack rates to be applied to their LTE SEPs.   Exhibit 3, Royalty Rates And Licensing Strategies For Essential Patents On LTE (4G) Telecommunication Standards. (available   via   subscription   at   http://www.lesi.org/les-nouvelles/les-nouvelles-online/2010/ september-2010/2011/05/02/royalty-rates-and-licensing-strategies-for-essential-patents-on-lte-(4g)-telecommunication-standards.)

26.     For its own SEPs, ZTE has publicly announced a portfolio rate.  ZTE has stated that it "will license its LTE essential patents for mobile communication terminals with a maximum 1% from the sales price of an end-user device" and "in multi-mode terminals, ZTE will follow a similar principle in setting the royalty rate for LTE patents".   Exhibit 4, http://wwwen.zte.com.cn/en/ press_center/news/200810/t20081008_350799.html.  At this time, ZTE had very few issued patents in their LTE portfolio.

27.     Indeed, there is no rule in the ETSI IPR Policy requiring that an SEP owner provide FRAND terms and conditions on a per-patent basis.  The ETSI IPR Policy merely requires that a patent owner must be prepared to grant licenses on FRAND terms for its SEPs in relation to, inter alia, selling, leasing, repairing, using, or operating standards-compliant equipment.   Exhibit 1, ETSI IPR Policy, Clause 6.1; see also ETSI IPR Policy, Section 15, Definition 4 ("'EQUIPMENT' shall mean any system, or device fully conforming to a STANDARD.")

28.     Fundamentally, SEPs owned by a company are to be licensed by that company in the way that it chooses, provided that the licensing is on FRAND terms and conditions.  There is no further obligation on the SEP owner.  This is because the FRAND licensing obligation is an exception to the exclusive rights granted to an SEP owner and must be construed as narrowly as possible.  The SEP owner must merely provide one type of FRAND license.  If the SEP owner chooses portfolio licensing which is on FRAND terms, then the potential licensee cannot insist on any other method of licensing.

**Reverse Patent Hold-Up**

29.     The concept of "reverse patent hold-up" has been described by the United States ITC:

> In reverse patent hold-up, an implementer utilizes declared-essential technology without compensation to the patent owner under the guise that the patent owner's offers to license were not fair or reasonable. The patent owner is therefore forced to defend its rights through expensive litigation. In the meantime, the patent owner is deprived of the exclusionary remedy that should normally flow when a party refuses to pay for the use of a patented invention.

Exhibit 5, *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Portable Music and Data Processing Devices, and Tablet Computers*, U.S.

International Trade Commission, Inv. No. 794, Comm'n Op. at 63 (July 5, 2013) (public version).

30.     In the long term, lowering compensation to innovative companies that contribute the technology underpinning the standards devalues patents and, thus, diminishes incentives for those companies to engage in R&D directed to contributing advanced technology to standards organizations.   Exhibit 6, Letter dated Nov. 19, 2014 from Irwin Mark Jacobs, Founding Chairman and CEO Emeritus Qualcomm to IEEE.

31.     The Regional Court in Mannheim, Germany has also recognized the potential for abuse by an infringer of exclusionary remedies, such as injunctions, were not available:

> Just as the compulsory license plea seeks to prevent patent proprietors undue influence in the negotiations, it cannot be its purpose to give the patent users undue influence.   The patent proprietor would still be able to pursue claims for information and damages even if merely stating a willingness to negotiate were enough to substantiate the compulsory license plea without extending the compulsory license plea to the aforementioned claims, ***but this could harm the patent proprietor's chances for success for negotiating a FRAND license and avoiding litigation.   It seems doubtful that the patent user's willingness to enter into serious negotiations could be adequately ensured if it no longer had to fear any claims for injunctive relief*** *even in unwilling to enter into serious negotiations.   **In such a situation, it could be more opportune for patent users to let themselves be sued for damages and information, thereby possibly forcing the patent proprietor to engage in excessive litigation.***

Exhibit 7, Regional Court Mannheim Order, 2nd Civil Div., No. 2 O 41/13 at 39 (Dec. 17, 2013) (emphasis added).

32.     "Patent hold-up" is the opposite of "reverse patent hold-up."   In patent hold-up, an SEP owner uses the leverage of the standard setting process to negotiate higher royalties than it could have received before the patent was incorporated into the standard.   However, the former Chairman of ETSI, Dr. Michael Walker, testified before the ITC that he was not aware of patent hold-up ever being a problem.   Exhibit 8, *In the Matter of Certain Electronic Devices, Including*

*Wireless Communication Devices, Portable Music and Data Processing Devices, and Tablet Computers*, U.S. International Trade Commission, 794 Hearing Tr. at 1440:24-1441:10.

**Vringo's SEPs**

33.     In August 2012, Vringo purchased a patent portfolio from Nokia Corporation.  A significant number of these patents are declared as essential or potentially essential, for example, to 2G, 3G, and 4G telecommunication standards – including the Global System for Mobile Communications    ("GSM")    Standard    (2G    technology),    the    Universal    Mobile Telecommunications System ("UMTS") Standard (3G technology), and Long Term Evolution ("LTE") (4G technology).  In other words, the technology of these patents is claimed as essential or potentially essential for the operation of telecommunications equipment and, thus, these patents are SEPs.  Vringo's patent portfolio includes hundreds of SEPs throughout the world. The Vringo SEPs cover fundamental aspects of telecommunications equipment and their operation.  Vringo's patent portfolio also includes hundreds of patents that are not SEPs.

34.     Since the Vringo SEPs are declared as essential or potentially essential to the relevant standards, to the extent that patents are actually essential under the relevant definitions of the applicable rules of certain SSOs, Vringo must be prepared to grant licenses under those patents on FRAND terms and conditions.  The remaining Vringo patents are not subject to FRAND requirements.

35.     As a part of the acquisition of the Vringo SEPs from their prior owner, Vringo contractually affirmed that it undertook to abide by all applicable obligations to the relevant SSOs.

**ZTE Failure to Obtain a License to Vringo's SEPs**

36.     ZTE Corp., which is publicly traded on the Shenzhen and Hong Kong stock exchanges, manufactures, distributes, and sells telecommunications products such as infrastructure equipment and smartphones throughout the world through its subsidiaries.

37.     Since 2002, ZTE has been selling GSM, UMTS and/or LTE compliant telecommunications equipment that uses Vringo's patented technology.  ZTE has done so and continues to do so without a license to the Vringo SEPs.

38.     Despite attempts by Vringo – including an in-person meeting at ZTE's Shenzhen headquarters attended by Vringo senior management and follow-ups by phone and in-person meetings (including a meeting in Brussels on December 10, 2014 and Vringo's New York office on February 6, 2015) – ZTE has refused to take a license to the Vringo SEPs.

39.     Upon information and belief, when approached by the prior owner of the Vringo SEPs, ZTE refused to take a license to any of the prior owner's SEPs, which included the Vringo SEPs.  Upon information and belief, this refusal lasted approximately 10 years.

40.     To date, ZTE has not taken a license to any of the Vringo SEPs.  ZTE has similarly refused to take a license to other companies' SEPs.  Even Huawei, another Chinese telecommunications company, has had to sue ZTE in several jurisdictions around the world in an attempt to secure a license in relation to Huawei's SEPs.

41.     As a result of ZTE continuing to sell products without a license, since October 2012 Vringo has brought patent infringement lawsuits against ZTE and its subsidiaries in certain countries where Vringo's SEPs are in force and ZTE sells allegedly infringing products, including in Australia, Brazil, France, Germany, India, Malaysia, the Netherlands, Romania, and the United Kingdom.

42.     In a number of litigation proceedings throughout the world, ZTE has taken the position that it will not consider negotiating the terms of a license for any Vringo patent until that patent has first been determined by a court to be both valid and infringed.  As a result, Vringo has been forced to bring lawsuits against ZTE to prove that Vringo's patents are valid and infringed.   In many of those jurisdictions, ZTE has alleged either directly or implicitly that Vringo, through its litigations, has violated relevant antitrust laws that purportedly govern the enforcement of SEPs, even though it is ZTE that has insisted that litigation is necessary before ZTE will take a license.  In other words, ZTE insists that Vringo must prove that its patents are valid and infringed in court before ZTE will consider taking a license, but then contends that any attempt to obtain such a judgment breaches Vringo's FRAND obligations or violates competition law.  In some instances, ZTE has even refused to take a license or make an offer after the patent has been found by courts to be valid and/ or infringed.

**The Parties' History**

43.     On September 25, 2012, Vringo wrote to ZTE seeking to initiate potential license negotiations.  The letter informed ZTE that it does not currently have a license under any of the patents in Vringo's portfolio, including the Vringo SEPs.  The letter invited ZTE to consider whether it required a license to Vringo's patents.  The letter also made it clear that Vringo is prepared to license all SEPs on FRAND terms and conditions.  The letter further requested that if ZTE believed a license was necessary, ZTE formally request such a license.  At the time the letter was sent, a list of the patents Vringo had acquired from Nokia, including SEPs, was available to ZTE.

44.     ZTE failed to respond to Vringo's September 25th letter and gave no indication that it was interested in a license.

45.     Given ZTE's reputation in the industry – which, upon information and belief,

includes a history of engaging in questionable behavior – as well as the fact that ZTE had been operating without a license from the prior owner of the Vringo SEPs since 2002, on October 5, 2012, Vringo filed a lawsuit in the UK against ZTE's UK subsidiary for infringement of three Vringo SEPs – the UK parts of EP 1 212 919, EP 1 166 589 and EP 1 808 029.

46.     Even after Vringo's initiation of litigation, ZTE did not respond to Vringo's September 25th letter.  Therefore, on November 15, 2012, Vringo filed a lawsuit in the Regional Court in Mannheim, Germany against ZTE and its German subsidiary for infringing the German part of EP 1 212 919.  On December 3, 2012, still hearing nothing from ZTE, Vringo filed another lawsuit in the UK for infringement of three additional Vringo SEPs – the UK parts of EP 1 330 933, EP 1 221 212, EP 1 186 119.

47.     On February 1, 2013, Vringo's UK counsel sent a letter to ZTE's UK counsel reiterating that ZTE had failed to respond to Vringo's September 25 letter.   This correspondence also made it clear that Vringo is proceeding on the assumption that ZTE is "unwilling and remains unwilling to take a license" under the patents.

48.     After months of silence from ZTE, on February 20, 2013, Vringo expanded its German litigation against ZTE to include the German part of EP 1 186 119.  By February 2013, Vringo had asserted six SEP families against ZTE and its subsidiaries.

49.     In a March 14, 2013 letter to Vringo's counsel, ZTE's UK counsel responded to the February 1, 2013 correspondence from Vringo's counsel, demanding that Vringo provide ZTE with a proposed license.  ZTE's counsel also represented that "ZTE will take a license, on FRAND terms, under *any of the Patents which is found to be valid and infringed in these proceedings*" (emphasis added).  Despite these preconditions, however, ZTE's counsel insisted on receiving a draft license of the terms that Vringo contended to be FRAND.

23

50.     On March 22, 2013, ZTE's UK counsel wrote a follow-up letter clarifying that the requested FRAND license terms should be limited to "the patents in these [UK] proceedings."

51.     On March 28, 2013, Vringo (through its UK counsel) provided ZTE with a proposed licensing term sheet that contained its rack rates and key license terms, including the royalty rate for a global license to the Vringo SEPs as well as separate royalty rates by technology standard (e.g., GSM, UMTS, and LTE) (the "Term Sheet").  The Term Sheet provided the FRAND terms and conditions under which Vringo would license its SEPs and proposed a worldwide license to any of Vringo's SEPs.   The Term Sheet was made public in June 2013 and appears on Vringo's website at http://www.vringoip.com/ documents/FG/vringo/ip/35142_CMC_Term_Sheet.pdf.   The Term Sheet contains the royalty rates that Vringo offers to any potential licensee who seeks to license the Vringo SEPs.  Vringo offered to negotiate the terms of the Term Sheet with ZTE.

52.     Vringo's opening FRAND offer for a global license to its SEPs contains the following rates:

> $2.50 per smartphone
> $1.20 per mobile device (excluding smartphones)
> 1.50% of infrastructure revenue.

53.     Vringo's rates are well within the range of published FRAND industry rates.

54.     The provisions of the Term Sheet, including the royalty rates and offer of a portfolio license, are FRAND.  By proposing the Term Sheet, Vringo satisfied its FRAND obligations.  ZTE, on the other hand, has not satisfied its own FRAND obligations because (1) ZTE has sought to unreasonably delay entering into a license for the Vringo SEPs on FRAND terms, (2) failed to seek a license on FRAND terms, and (3) refused to (a) engage in good faith negotiations for a license on FRAND terms, (b) propose any specific counteroffer (other than to say ZTE is entitled to individual patent licenses), (c) identify the provisions of the

Term Sheet that ZTE believes are not FRAND, (d) propose alternative provisions to the Term Sheet, and/or (e) deposit money into escrow.  As such, ZTE is an unwilling licensee.

55.     Without any attempt by ZTE to engage in negotiations with Vringo or propose any counter offer, on April 2, 2013, Vringo filed a lawsuit in France against ZTE and its French subsidiary for infringement of the French parts of EP 1 221 212 and EP 1 186 119.  In the French case, ZTE has contended that it is already a party to a license agreement with Vringo by operation of French law.  Although ZTE contends it is licensed, ZTE had made no attempt to pay Vringo any compensation for the patents that are purportedly licensed or even to resolve the terms of any such license.

56.     In an April 18, 2013 letter from its UK counsel, ZTE again requested terms for a license limited to just the asserted patents in the UK.  Despite ZTE's refusal to negotiate a global portfolio license (or even a UK-only portfolio license) to the Vringo SEPs, the letter purports that Vringo "has no legitimate claim to an injunction."

57.     On May 17, 2013, Vringo's Australian counsel sent a letter to ZTE Australia that informed ZTE Australia that Vringo believed that at least two of Vringo's SEPs in Australia were being infringed by ZTE.  The letter specifically mentioned ZTE products that Vringo believed were infringing—including handsets and infrastructure equipment.  The letter reiterated the availability of a FRAND license on the terms set forth in the Term Sheet.

58.     On May 24, 2013, a person identified only as "Oliver" from ZTE Australia responded that ZTE treats "IPR owners evenly and as long as the value of the IPR is fully proven and ZTE AUSTRALIA did use the technology covered by the claims of the patents, [ZTE] will be decided to compensate IPR owners for their [i]nnovations."  It was later determined that "Oliver" is Mr. Oliver Hu, ZTE's chief litigation officer.

59.     On May 29, 2013, Vringo's Australian counsel reiterated that Vringo "has not made an offer to license on a per-patent or per-country basis" nor does Vringo's "position contemplate that [Vringo] must first demonstrate in court the validity or infringement of any of those patents."  The letter requested that ZTE remove the precondition set by ZTE that Vringo's SEPs first be shown to be valid and infringed in court before ZTE would negotiate.

60.     With ZTE unwilling to accept Vringo's FRAND offer or agree to negotiate without the precondition that Vringo's SEPs first be shown to be valid and infringed in court, on June 11, 2013, Vringo filed a lawsuit in Australia against ZTE's Australian subsidiary for infringement of two Vringo SEPs – AU 2005212893 and AU 0773182 (which corresponds to EP 1221212).  By June 2013, Vringo had now asserted seven SEP families against ZTE and its subsidiaries.

61.     With a number of litigation proceedings now under way and without any attempt by ZTE to engage in negotiations with Vringo or propose any counteroffer, in June 2013, Vringo proposed to have a neutral arbiter – the United Kingdom High Court of Justice (the "UK High Court") – determine whether the Term Sheet, including its rack rates, were in accordance with FRAND principles.  Vringo further proposed, that if any provision of the Term Sheet was not in accordance with FRAND principles, that the UK High Court alter the royalty rate and/or amend the key terms of the Term Sheet to bring the Term Sheet into compliance with FRAND principles.  Vringo agreed to be unconditionally bound by the UK High Court's determinations. The UK High Court was willing to make such determinations if ZTE agreed.  ZTE, however, refused.

62.     On November 7, 2013, Vringo filed a lawsuit in India against ZTE and its Indian subsidiary for infringement of another Vringo SEP – IN 243980, thereby expanding assertions

against ZTE to eight SEP families.  Vringo requested and received a preliminary injunction against ZTE and its Indian subsidiary.  The preliminary injunction was subsequently substituted by an interim arrangement by which ZTE was required to post a bond and inform Vringo of all imports of certain ZTE products into India.

63.     In an effort to settle the dispute between Vringo and ZTE, in late November 2013, after over a year of litigation, Vringo proposed a meeting with ZTE to discuss a resolution to the dispute between the parties.  Vringo agreed to meet ZTE in Shenzhen, China at ZTE's headquarters.  A meeting was set for December 10, 2013.

64.     Prior to the meeting, in late November 2013, Vringo provided ZTE with a proposed non-disclosure agreement ("NDA") so that the parties could engage in good faith negotiations and freely discuss their settlement positions.

65.     On December 9, 2013, ZTE returned a signed copy of the NDA (which is dated effective December 6, 2013) to Vringo.  The NDA places strict restrictions on the use and disclosure of confidential settlement information.

66.     On December 10, 2013, Alexander R. Berger, Vringo's then Chief Operating Officer, and Jason S. Charkow, Vringo's then Senior Intellectual Property Counsel, traveled to ZTE's headquarters in Shenzhen, China to personally engage ZTE in an attempt to commence FRAND licensing and settlement negotiations. At that meeting and in reliance on the NDA, Vringo provided a 40-page presentation to ZTE which included payment terms and a roadmap explaining how Vringo arrived at Vringo's opening settlement offer.

67.     Within a few months of the December 10th meeting (on February 21, 2014), ZTE filed a complaint against Vringo for violation of the Chinese Anti-Monopoly Law in its home

jurisdiction in China, the Shenzhen Intermediate People's Court, relying on the content of Vringo's presentation in violation of the NDA.  The Chinese litigation is pending.

68.    On December 17, 2014, the Regional Court in Mannheim, Germany ("Mannheim Court") found that ZTE infringed the German part of EP 1 186 119.   The Mannheim Court was fully briefed on the issue of whether ZTE was an unwilling licensee.   The Mannheim Court determined that ZTE's conduct fell far short of the appropriate willing licensee conduct.  In its decision, the Mannheim Court found that ZTE had not shown a serious readiness to negotiate and, therefore, granted an injunction.  The Mannheim Court stated the following:

> Irrespective of that, the chamber also does not regard it as sufficiently likely that the ECJ, in taking into account a willingness to negotiate (in this direction, see also Hoppe-Janisch, Mitteilungen der deutschen Patentanwalte 2013, 384, 389/390). This type of seriousness will have to be enforced if for no other reason than to eliminate delay tactics that the Commission also views critically and avoid inappropriately putting the interests of the patent proprietor behind those of the user.  If merely stating one's willingness to negotiate were adequate, after all, this would pose a risk that the patent proprietor could be stalled by signing a FRAND license agreement, thus weakening the patent proprietor's negotiating position. Just as the compulsory license plea seeksto prevent  patent proprietors  undue influence in the negotiations, it cannot be its purpose to give the patent users undue influence. The patent proprietor would still be able to pursue claims for information and damages even  if merely stating a willingness to negotiate were enough to substantiate the compulsory license plea without extending the compulsory license plea to the aforementioned claims, but this could harm the patent proprietor's chances for success for negotiating a FRAND license and avoiding litigation.  It seems doubtful that the patent user's willingness to enter into serious negotiations could be adequately ensured it it no longer had to fear any claims for injunctive relief even in unwilling to enter into serious negotiations.  In such a situation, it could be more opportune for patent users to let themselves be sued for damages and information, thereby possibly forcing the patent proprietor to engage in excessive litigation.
>
> Demanding a serious willingness to negotiate means asking whether a conditional willingness to purchase a license in the future if the use and validity have been settled in court is adequate.  Even if one puts aside this question, however, a serious willingness to negotiate has not been demonstrated here.  One must distinguish a serious willingness to negotiate-even relating only to the future purchase of a license-from the mere pretense of a willingness to negotiate for the sole purpose of delay.  Seen in this context, one must demand that there be a willingness for current negotiations and that the patent user look objectively at the

suggestions of the patent proprietor and not simply use delay tactics.  A serious willingness on the part of the patent user to negotiate also mean requiring the patent user to produce documentation and evidence if one requires a serious willingness on the part of the patent user to negotiate as a requirement for the merit of the compulsory license plea.  The defendants in the present case have not adequately demonstrated this type of serious willingness to negotiate.   The defendants did receive a licnese offer from the plaintiff and directed clarifying questions about the author to the plaintiff.  But simply noting that one asked clarifying questions is not enough to document a serious willingness to negotiate. Asking clarifying questions can also be a means for delaying the negotiations, after all, since it avoids dealing with the opposing party's offer in the form of counterproposals.  To rule this out, the defendants would have had to show which points in the plaintiff's offer were unclear and why these ambiguities hindered the defendants from dealing with the content of the offer by submitting a counterproposal.  Even when some points remain unclear, it is typically possible to inform the opposing party which points-or in which interpretation of these points-the parties agree on the proposal and which points-or again, in which interpretation of these points- are unacceptable and which counterproposals are in place.

Exhibit 7, Mannheim Court Order, 2nd Civil Div., No. 2 O 41/13 at 39-40 (Dec. 17, 2013) (emphasis added).

69.     In January 2014, ZTE filed a request for the suspension of the execution of the judgment issued by the Mannheim Court with the relevant German appellate court.  ZTE argued that the first instance court should have stayed the case pending the referral to the European Court of Justice ("ECJ") by the Düsseldorf court *In re: ZTE/Huawei*.   The German appellate court (in February 2014), having considered ZTE's arguments, rejected ZTE's request and declined to stay enforcement of the injunction, in particular, because ZTE failed to fulfill the requirements for a FRAND defense under German case law, even if anticipating likely modifications by the ECJ.

70.     In a letter dated January 24, 2014 to Vringo's UK counsel, ZTE's UK counsel again requested "the terms of a FRAND license for each of the patents [in suit]" and took issue with the fact that Vringo has only attempted to negotiate a worldwide license.  A similar letter was sent by ZTE's German counsel to Vringo's German counsel on the same day.  In neither

letter did ZTE make any concrete counter-offer for a license on FRAND terms and conditions or indicate that Vringo's term sheet was not FRAND.

71.     On April 10, 2014, ZTE filed a complaint with the European Commission (the "EC") alleging that Vringo infringed European antitrust laws (the "ZTE EC Complaint"). Vringo was served with a copy of the ZTE EC Complaint on May 15, 2014.  ZTE alleged that Vringo had violated its FRAND obligations, including by seeking injunctions against ZTE around the world.  On June 18, 2014, Vringo filed a response to the ZTE EC Complaint.  Since ZTE had rejected the UK High Court's offer to determine the parties' FRAND issues, following the model established in the EC's *Samsung* case, Vringo's response to the EC attached as exhibits a cover letter, two arbitration proposals to have an arbitration panel set the terms of a FRAND license between Vringo and ZTE, and a side proposal.  Vringo sent these same materials to ZTE on the same day that Vringo filed its response.   The first arbitration proposal contains an agreement to arbitrate the terms of a patent licensing agreement for the Vringo SEPs in the European Economic Area (EEA).  The second arbitration proposal contains an agreement to arbitrate the terms of a world-wide patent licensing agreement for the Vringo SEPs.  ZTE declined Vringo's arbitration proposals.

72.     To date, the EC has not initiated any investigation of Vringo.

73.     On April 14, 2014, Vringo filed a lawsuit in Brazil against ZTE and its Brazilian subsidiary for infringement of BR 0013975 (which corresponds to EP 1 212 919) and sought a preliminary injunction.   On April 15, 2014, the Brazilian court granted the preliminary injunction.  Brazilian courts have considered FRAND issues before issuing and upholding the injunction against ZTE and rejecting ZTE's numerous appeals.

74.     At the end of April 2014, Dutch customs in Rotterdam detained a container with UMTS-equipment originating from ZTE. The detention was based on the European Anti-Piracy Regulation (Regulation EU Nr. 608/2013) and followed a request for action that was filed by Vringo and granted by the Dutch customs authorities in 2013.   The products in the detained container were twenty (20) baseband units of the type ZXSDR B8200 GU360 ("B8200") and sixty (60) remote radio units of the type ZXSDR R8880A ("R8880A"). The detained products were intended for installation as base stations of the type ZXSDR BS8700 for ZTE's customer, E-Plus, in Germany.   Base stations of this type were previously found to infringe the German part of EP 1 186 119 and ZTE was enjoined from importing such base stations into Germany. After the detention, Vringo had the products seized for surrender on the basis of infringement of the Dutch part and the German part of EP 1 186 119.

75.     On May 9, 2014, ZTE Corp. initiated summary proceedings against Vringo at the District Court in Rotterdam to have its products released and have the court order Vringo to inform customs to refrain from taking further actions against ZTE's products. On the day of the hearing and before a decision was rendered, ZTE Corp. withdrew the summary proceedings.

76.     On May 9, 2014, pursuant to a request filed by Vringo against ZTE, the President of the District Court of The Hague in The Netherlands allowed a bailiff appointed by Vringo to seize further evidence of infringement with respect to the product-types that had been detained by customs (i.e. the B8200 base band unit and the R8880A remote radio unit) present at or available from a ZTE subsidiary's offices in The Netherlands.

77.     On May 21, 2014, the bailiff commenced the evidentiary seizure pursuant to the President's order, but ZTE refused to provide the bailiff access to ZTE's sales data in its external systems (e.g., by providing the necessary passwords and log-in codes) in violation of the

President's order. The penalty for noncompliance set by the President in his order was 50,000 Euros.   On May 22, 2014, the President increased the penalty for non-compliance to 50,000 Euros per hour (for every hour after a two hour grace period) until ZTE complied with the court order. Only then did ZTE comply with the President's order.   In May and June, evidence was seized which showed that ZTE had previously offered and sold the detained products in a number of other European countries.

78.      On May 28, 2014, Vringo instituted proceedings before the District Court in The Hague, in which it requested the surrender of the detained and seized products.   This case is currently pending.

79.      On June 23, 2014, Vringo filed a lawsuit in Malaysia against ZTE and its Malaysian subsidiary for infringement of a Vringo SEP – MY 142706 (which corresponds to EP 1 808 029).

80.      On June 23, 2014, Vringo filed a lawsuit in Romania against ZTE and its Romanian subsidiary for infringement of the Romanian part of EP 1 808 029.   At that time, Vringo also filed a request for a preliminary injunction.   On June 30, 2014, the Romanian trial court granted a preliminary injunction against ZTE.   Vringo subsequently informed Romanian customs of the injunction.   Thereafter, customs detained a number of infringement ZTE's products which were subsequently released to a ZTE customer upon the payment of a bond by that customer.

81.      On July 2, 2014, Vringo filed a lawsuit in the U.S. District Court for the Southern District of New York against ZTE and its United States subsidiary for breach of the parties' NDA ("NY NDA litigation").   Vringo requested a temporary restraining order and preliminary

injunction.  On July 7, 2014, the Court granted Vringo's request for a temporary restraining order which remains in place today.

82.     On July 4 2014, ZTE initiated a lawsuit against Vringo in the District Court of Rotterdam for wrongful detention of additional products that were later released by Vringo.  In that action, ZTE alleged that Vringo's actions violated Vringo's FRAND obligations. This case is currently pending, awaiting the resolution of Vringo's request to transfer the case to the District Court in The Hague (where all other matters between Vringo and ZTE are pending).

83.     On July 24, 2014, ZTE and its subsidiaries again initiated summary proceedings (which were previously withdrawn) with respect to the detained products, this time before the District Court in The Hague. In these summary proceedings, ZTE asked the court to order the release of the detained products from customs and to enjoin Vringo from filing further requests at Dutch customs for the detention of ZTE's products and from performing further civil law seizures on ZTE's products.  In these summary proceedings, Vringo and ZTE extensively briefed the issues of infringement and validity of the Dutch (and German) part(s) of EP 1 186 119, Vringo's FRAND obligations (and whether Vringo has violated its FRAND obligations by seeking the intervention of the Dutch customs authorities), and enforcement of the relevant parts of EP 1 186 119.

84.     On July 31, 2014, ZTE filed a lawsuit in Spain against Vringo seeking to invalidate the Spanish part of EP 1 212 919 and EP 1 221 212.  ZTE's complaint also alleged that Vringo engaged in unfair competition.

85.     On August 19, 2014, Vringo initiated infringement proceedings against ZTE and its subsidiaries in the District Court in The Hague related to EP 1 186 119.  In those proceedings, Vringo seeks a European-wide injunction against the sale of ZTE's infringing base stations –

including the base stations that were already found to infringe in Germany.  This case is currently pending.

86.     On September 16, 2014, a hearing was held before the District Court in The Hague related to the summary proceedings in which the issues of infringement and validity of the Dutch (and German) part(s) of EP 1 186 119, Vringo's FRAND obligations (and whether Vringo had violated its obligations), and enforcement of the relevant parts of EP 1 186 119 were extensively argued.  On October 24, 2014, the District Court in The Hague preliminarily found for Vringo on all issues.  In particular, the Court found that EP 1 186 119 was likely infringed and valid, ZTE was likely an unwilling licensee, and Vringo's seizure of ZTE's products was proper, notwithstanding ZTE's arguments that Vringo's actions were in violation of Vringo's FRAND commitments. On November 20, 2014, ZTE filed an appeal against this decision, but ZTE has not taken any further action in these appeal proceedings.  A full trial on the merits will be held at a later date.

87.     On September 16, 2014, ZTE appealed the Romanian preliminary injunction, arguing FRAND issues and stating that ZTE would suffer approximately EUR 30 million in contractual penalties with an injunction in place.  On October 10, 2014, the Romanian appellate court temporarily suspended enforcement of the preliminary injunction while it considered the appeal.  On December 17 and 18, 2014, the Romanian appellate court heard ZTE's appeal.  As part of the appeal, Vringo and ZTE extensively briefed and argued the appeal, including ZTE's arguments that Vringo's request for a preliminary injunction against ZTE violates Vringo's FRAND obligations and ZTE would suffer an approximately EUR 30,000,000 contractual penalty with an injunction in place.  On January 8, 2015, after considering the issues briefed by the parties, the Romanian appellate court: (i) denied ZTE's appeal seeking cancellation of the

order no. 801/2014 of the Bucharest Tribunal granting the preliminary injunction of the preliminary injunction; and (ii) revoked the interim suspension of enforcement of the preliminary injunction.   The Romanian appellate court granted ZTE's appeal requesting for payment of a bond and ordered Vringo to deposit a bond of EUR 240,000.   On or around January 16, 2015, ZTE filed a request with the Romanian appellate court to increase the amount of the bond to EUR 40,003,916.   ZTE's request was denied.   In January 2015, Vringo sent letters to ZTE's customers and distributors informing them of the injunction.

88.     By September 2014, ZTE had refused to comply with a court order to produce its contracts with Brazilian carriers, and Vringo had learned that ZTE continued to sell, import and/or commercialize equipment in Brazil in violation of the Brazilian injunction.   On September 6, 2014, Vringo sought a search and seizure order from the Brazilian court which was granted on October 2, 2014.

89.     On October 23, 2014, ZTE filed separate proceedings against Vringo in the District Court in The Hague seeking to invalidate the Dutch part of EP 1 212 919.

90.     A trial in the UK related to the UK part of EP 1 212 919 took place between October 28, 2014 and November 4, 2014.   On November 28, 2014, the UK High Court found the UK part of EP 1 212 919 to be valid and infringed.

91.     On December 1, 2014, Vringo accompanied a court officer and court appointed experts on a raid of a ZTE warehouse in Hortolandia, São Paulo, Brazil.  After reviewing ZTE's records, the court officer seized a significant number of documents and equipment that ZTE was enjoined from commercializing in violation of the Brazilian injunction as shown below.

 

92.     During the raid, ZTE failed to present the accounting documents as ordered by the Brazilian court.  From the documents that were seized during the raid, it was uncovered that ZTE sold hundreds of infringing products in violation of the injunction.  During the raid, ZTE turned off the air conditioning, presented a chart with a description of the equipment in stock written in Chinese, and only presented customer invoices to the court appointed experts at the end of the day, making it impossible for the experts to make a thorough analysis of the physical stock and accounting documents as ordered by the Brazilian court. Moreover, ZTE failed to comply with the Brazilian court's order that required ZTE to provide other documents besides the invoices, such as importation declarations for the equipment.

93.     On December 5, 2014, after having withdrawn its lawsuit in the Mannheim Court regarding the German part of EP 1 212 919, Vringo re-filed its lawsuit in the Regional Court in Düsseldorf, Germany against ZTE and its German subsidiary for infringement of the German part of EP 1 212 919.

94.     On December 18, 2014, ZTE filed a request with the UK High Court to reopen the EP 1 212 919 hearing, seeking to introduce new prior art.  The UK High Court denied this request on January 30, 2015 and denied ZTE's request to appeal the decision.  ZTE has no possibility of further appeal.

95.     On January 13, 2015, Vringo received an investigation notice from the NDRC. Upon information and belief, the NDRC investigation was initiated at the request of ZTE.

96.     On February 5, 2015, ZTE filed *inter-partes* review before the U.S. Patent & Trademark Office seeking to invalidate three Vringo SEPs which correspond to EP 1 330 933, EP 1 186 119 and IN 243980.

97.     On February 5, 2015, at approximately 7 p.m., ZTE filed a complaint against Vringo for breach of contract in the U.S. District Court for the District of Delaware ("Delaware Complaint").  At that time, ZTE sought a temporary restraining order and preliminary injunction barring Vringo from (1) taking any action to exclude ZTE products in Romania during the pendency of this FRAND proceeding; and (2) contacting any of ZTE's customers, vendors or suppliers anywhere in the world to inform them of any Order to cease sales of ZTE products during the pendency of this FRAND proceeding.

98.     At 10:35 a.m. on Friday, February 6, knowing that Vringo was in meetings with ZTE that day, ZTE's counsel contacted Vringo's counsel in the NY NDA litigation ("Vringo's SDNY counsel") about the Delaware case.  ZTE was therefore fully aware that key Vringo decision makers would be occupied with these discussions on the day ZTE's counsel was reaching out to discuss the timing of the Delaware case.  Vringo's SDNY counsel informed ZTE's counsel that Vringo was seeking to engage counsel for the TRO application.  Approximately three hours after the initial contact, Vringo's SDNY counsel emailed ZTE's counsel to confirm they would represent Vringo and communicated availability for a hearing on the injunctive relief ZTE was seeking. Thirty minutes

later, ZTE's counsel's next communication attached a copy of the temporary restraining order and preliminary injunction entered by the Delaware Court.

99.     In the Delaware Complaint, ZTE alleges that there is a contract between Vringo and ETSI to which ZTE is a third party beneficiary and that Vringo has breached that contract.   In particular, ZTE alleges that Vringo has failed to negotiate in good faith toward a FRAND license with ZTE and has failed to offer and grant a FRAND license to ZTE.   ZTE further alleges Vringo filed numerous foreign actions in which it sought to obtain injunctive relief based on allegations of patent infringement for patents that had been declared to ETSI to be standard-essential.  According to ZTE, by virtue of Vringo's FRAND commitments, Vringo effectively agreed to forego injunctions or exclusionary relief against parties willing to agree to FRAND license terms.

100.    ZTE's complaint regarding Vringo's actions against ZTE, including Vringo's attempts to seek injunctions against ZTE based on the infringement of Vringo's SEPs, relates to *global* litigations that have all occurred outside of the United States.

101.    Yet, ZTE sought for the Delaware court to impose remedies against Vringo on a *global scale*, including damages for Vringo's purported breach of contract and injunctive relief against Vringo on a global basis with respect to the Vringo SEPs.

102.    On February 9, 2015, Vringo filed a motion to dissolve the temporary restraining order and preliminary injunction.

103.    On February 10, 2015, the parties attended a telephonic hearing before Judge Sleet.   Judge Sleet granted Vringo's motion to dissolve the temporary restraining order and preliminary injunction and ordered the Delaware Complaint to be transferred to this Court for consolidation with the NY NDA litigation.

104.    On February 17, 2015, based on ZTE's representation to Vringo that ZTE only intends to sell equipment in the UK that is not fully compliant with ETSI standards and therefore

will not infringe the claims-in-suit in the UK in the future, Vringo withdrew its infringement claims against ZTE on the UK parts of EP 1 808 029, EP 1 221 212 and EP 1 186 119.  Vringo's claim against ZTE for infringement of the UK part of EP 1 330 933 remains pending, and is currently scheduled to be heard by the UK High Court in a trial starting on June 8, 2015.

**ZTE Request for a Portfolio License in the InterDigital Litigation**

105.    On January 2, 2013, InterDigital  Communications, Inc., InterDigital Technoogy Corporation, IPR Licensing, Inc., and InterDigital Holdings, Inc. (collectively, "InterDigital") asserted a number of SEPs ("InterDigital SEPs") against ZTE in an investigation before the U.S. International Trade Commission.  InterDigital sought an exclusion order against ZTE products in the United States.

106.    On the same day, InterDigital brought a corresponding patent infringement lawsuit against ZTE in the U.S. District Court for the District of Delaware for infringement of the InterDigital SEPs.

107.    On March 22, 2013, ZTE served an answer to InterDigital's Amended Complaint. In its Answer, ZTE sought similar relief against InterDigital that it sought against Vringo in the Delaware Complaint.  In addition, in the InterDigital litigation, ZTE sought a declaratory judgment setting an appropriate FRAND royalty to license all of InterDigital's U.S. patents, including the InterDigital SEPs, that have been declared essential to a standard used by any products accused of infringement.  As such, ZTE sought an SEP *portfolio license* from a U.S. court.

108.    On April 25, 2013, in opposing a motion to dismiss filed by InterDigital, ZTE sought for the U.S. District Court for the District of Delaware to decide the terms of a FRAND license for a portfolio of SEPs, including a royalty rate, *prior to* a determination of infringement, validity, and essentiality of those SEPs.  ZTE asserted that claims based on FRAND licensing

obligations are not contingent upon the results of patent infringement suits regarding the same patents and that such claims are therefore ripe when declared-essential patents have been sued on.  ZTE further asserted that its counterclaim seeking such a decision on a FRAND license was ripe and that a U.S. court determining the terms of a FRAND license for a portfolio of SEPs would resolve the disputes between the parties.

### COUNT I
### DECLARATORY JUDGMENT DETERMINING A FRAND LICENSE

109.    Vringo incorporates Paragraphs 1 through 108 by reference as if set forth expressly herein.

110.    Vringo requests from this Court a declaratory judgment setting FRAND terms for a license agreement between Vringo and ZTE for the Vringo SEPs.  Vringo agrees and commits to be unconditionally bound to enter into a license on the terms set forth by this Court.

111.    Any license agreement between Vringo and ZTE should be global in scope and should cover Vringo's entire portfolio of SEPs.

112.    This controversy involves the rights or other legal relations of Vringo related to Vringo's FRAND obligations.

113.    ZTE has an interest in contesting Vringo's claim.

114.    The parties' interests are real and adverse.

115.    There is an actual and justiciable controversy between Vringo and ZTE over FRAND license terms for a license to the Vringo SEPs.

116.    Vringo has issued a TERM SHEET that Vringo believes is on FRAND terms. ZTE has denied on multiple occasions that the terms offered by Vringo were FRAND.

117.     A declaratory judgment of FRAND license terms for a license to the Vringo SEPs will determine the parties' respective legal rights with regard to Vringo's and ZTE's respective compliance with their respective FRAND obligations.

118.     A declaratory judgment would completely resolve the issues between the parties, because Vringo commits to be unconditionally bound to enter into a license upon the terms determined by this Court.

**COUNT II**
**PLEAD IN THE ALTERNATIVE – BREACH OF CONTRACT**
**– SPECIFIC PERFORMANCE**

119.     Vringo incorporates Paragraphs 1 through 118 by reference as if set forth expressly herein.

120.     Vringo pleads this counterclaim in the alternative to Count I.

121.     ZTE has alleged that Vringo and ZTE are parties to a contract based on Vringo's assumption of certain FRAND commitments.

122.     In the event that the Court determines that Vringo is a party to a contract with an SSO and that ZTE is a party to or third party beneficiary of that contract, or the parties are otherwise contractually bound to each other, Vringo seeks specific performance of ZTE's obligations under that contract.  If a contract is found to exist, ZTE breached that contract.

123.     ZTE cannot have it both ways.  In order to exercise its rights under any FRAND contract, to the extent this Court determines that one exists, ZTE must also accept and abide by its own obligations under any such contract to enter into a license to the Vringo SEPs on FRAND terms.  To the extent Vringo is bound by FRAND obligations, Vringo is also entitled to enforce ZTE's own obligations under the contract.

124.     If a FRAND contract were formed between Vringo and an SSO to which ZTE is a party or a third party beneficiary, ZTE bears the obligation to accept a FRAND license offer

made by Vringo rather than continuing to manufacture infringing products indefinitely while refusing to pay FRAND compensation.  Vringo has made such an offer to ZTE by offering its Term Sheet to ZTE.  ZTE has breached its own contractual obligations including by, among other things, failing to pay royalties, refusing to accept this offer and/or refusing to negotiate toward a license in good faith.

125.     ZTE's unwillingness to negotiate in good faith has been repeatedly made manifest by, among other things: (1) its unreasonable delay in entering into a license for the Vringo SEPs on FRAND terms, (2)  its refusal to propose any specific counteroffer (other than to say ZTE is entitled to individual patent licenses), (3) its failure to identify any provisions of Vringo's FRAND offer that it believes are not FRAND, (4) its failure to propose alternative provisions to Vringo's Term Sheet, and/or (5) its failure to deposit or offer to deposit money into escrow.

126.     As a result of ZTE's breach of its contractual obligations, Vringo has been forced to bring and/or defend a series of costly legal proceedings around the world in an attempt to obtain fair compensation for the use of the Vringo SEPs.  In the interim, ZTE continues to profit from the use of Vringo's SEPs without offering payment of any kind.

127.     Vringo therefore seeks an award of specific performance requiring ZTE to comply with its contractual obligations, including but not limited to entering into a license on FRAND terms set by the Court.

128.     Vringo has no adequate remedy at law for ZTE's breach of its contractual obligations.

### COUNT III
### PLEAD IN THE ALTERNATIVE –BREACH OF CONTRACT – TERMINATION / DAMAGES

129.     Vringo incorporates Paragraphs 1 through 128 by reference as if set forth expressly herein.

130.     Vringo pleads this counterclaim in the alternative to Counts I and II.

131.     ZTE has alleged that Vringo and ZTE are parties to a contract based on Vringo's assumption of certain FRAND commitments.

132.     In the event that the Court determines that Vringo is a party to a contract with an SSO and that ZTE is a party to or third party beneficiary of that contract, or the parties are otherwise contractually bound to each other, Vringo seeks an award of damages based on ZTE's breach of its own obligations under that contract.  If a contract is found to exist, ZTE breached that contract.

133.     ZTE cannot have it both ways.  In order to exercise its rights under any FRAND contract, to the extent this Court determines that one exists, ZTE must also accept and abide by its own obligations under any such contract to enter into a license to the Vringo SEPs on FRAND terms.  To the extent Vringo is bound by FRAND obligations, Vringo is also entitled to enforce ZTE's own obligations under the contract.

134.     If a FRAND contract were formed between Vringo and an SSO to which ZTE is a party or a third party beneficiary, ZTE bears the obligation to accept a FRAND license offer made by Vringo rather than continuing to manufacture infringing products indefinitely while refusing to pay FRAND compensation.  Vringo has made such an offer to ZTE by offering its Term Sheet to ZTE.  ZTE has breached its own contractual obligations including by, among other things, failing to pay royalties, refusing to accept this offer and/or refusing to negotiate toward a license in good faith.

135.     ZTE's unwillingness to negotiate in good faith has been repeatedly made manifest by, among other things: (1) its unreasonable delay in entering into a license for the Vringo SEPs on FRAND terms, (2)  its refusal to propose any specific counteroffer (other than to say ZTE is

entitled to individual patent licenses), (3) its failure to identify any provisions of Vringo's FRAND offer that it believes are not FRAND, (4) its failure to propose alternative provisions to Vringo's Term Sheet, and/or (5) its failure to deposit or offer to deposit money into escrow.

136.    As a result of ZTE's breach of its contractual agreements, Vringo has been forced to bring and/or defend a series of costly legal proceedings around the world in an attempt to obtain fair compensation for the use of the Vringo SEPs.  In the interim, ZTE continues to profit from the use of Vringo's SEPs without offering payment of any kind.

137.    Therefore, Vringo seeks an award of damages resulting from ZTE's breach of its contractual agreement, including all attorneys' fees and costs spent in participating in each legal proceeding between the parties discussed in these counterclaims and any other damages determined to be appropriate, as well as any additional relief that may be appropriate or required to address ZTE's breaches.

138.    Vringo also seeks a declaration that, because of the breach, Vringo is entitled to terminate any contractual obligations to ZTE and to enforce the Vringo SEPs to the maximum extent permitted under applicable law.

## JURY TRIAL DEMANDED

Vringo hereby demands a trial by jury of all issues raised in its counterclaims.

## PRAYER FOR RELIEF

WHEREFORE, having fully answered the Complaint and having asserted its counterclaims against ZTE, Vringo respectfully requests:  (i) that the Court enter judgment in Vringo's favor on ZTE's claims; (ii) that the costs of this action be cast upon ZTE; and (iii) that Vringo be granted judgment in its favor on its counterclaims and against ZTE as follows:

(i)      Entering a declaratory judgment establishing FRAND license terms, including a
         royalty rate, for a license to the Vringo SEPs;

(ii) In the event that the Court determines that Vringo is a party to a contract with an SSO and that ZTE is a party to or third party beneficiary of that contract, or that the parties are otherwise contractually bound to each other, finding a breach of contract by ZTE and issuing an order of specific performance requiring ZTE to comply with its contractual obligations, including but not limited to entering into a license on FRAND terms set by the Court; and

(iii) In the event that the Court determines that Vringo is a party to a contract with an SSO and that ZTE is a party to or third party beneficiary of that contract, or that the parties are otherwise contractually bound to each other, finding a breach of contract by ZTE and awarding damages in an amount to be proven at trial for ZTE's breach of contract and/or issuing a declaration that, because of the breach, Vringo is entitled to terminate its contractual obligations and to enforce the Vringo SEPs to the maximum extent permitted under applicable law.

February 27, 2015     Respectfully submitted,

          _____/s/ Karl Geercken_____

          Karl Geercken
          Amber Wessels-Yen
          ALSTON & BIRD LLP
          90 Park Avenue
          New York, New York 10016
          Telephone: (212) 210-9400
          Facsimile: (212) 210-9444
          karl.geercken@alston.com
          amber.wessels-yen@alston.com

          *Attorneys for Defendants-Counterclaim Plaintiffs*
          *Vringo, Inc. and Vringo Infrastructure, Inc.*